## HARNED v. CHURCHMAN et al.

Where the consignees of a vessel, who had had other transactions with the owner, make advances to the captain, for services and supplies furnished to the vessel, for towage, pilotage, custom-house charges, and furnish him with cash for other purposes not shown, and, though informed by the owner of his intention to sell the vessel, take a bill of exchange on him, drawn by the master at thirty days, for the amount, and permit the vessel to depart, they must be considered as having made the advances solely on the personal credit of the owner, and cannot claim any lien, or tacit hypothecation, for the amount advanced, on the vessel in the hands of the vendee of one who had purchased the vessel while on her voyage to the port to which she was consigned.

To authorize the master to hypothecate a vessel by bottomry, it must appear that the advances were made for repairs, or supplies, necessary for the voyage or the safety of the vessel, and that the repairs or supplies could not have been procured on reasonable terms, nor with funds in the master's control, nor upon the credit of the owner independent of the hypothecation. It is essential to the lawful exercise of this power that, no other means of procuring funds, at the place at which they were required, existed.

The taking of a bill of exchange upon the owner for advances made to the master, or for amounts due to material-men, or wages to seamen, is presumptive evidence that the credit is personal to the owner, and that any lien on the vessel is waived.

APPEAL from the Fourth District Court of New Orleans, *Strawbridge,* J. *Baer,* for the plaintiff, cited *The Jerusalem,* 2 Gallison, 347. *The Aurora,* 1 Wheaton, 96. 3 Kent, 132, 169. C. C. 3204. *Parish* v. *Crawford,* Strange's Rep. 1251.

*Bradford,* for the appellant, relied on C. C. 2156, 2157. *Grant* v. *Fiol,* 17 La. 160. *Agricultural Bank* v. *Barque Jane,* 19 La. 9. *Hill* v. *Phœnix Co.,* 2 Rob. 36. *Hyde* v. *Calver, ante* p. 9. *Harper* v. *A new Brig,* 1 Gilpin, 536. Abbott on Shipping, (ed. 1846), pp. 200, 202.

The judgment of the court *(King,* J. absent,) was pronounced by

SLIDELL, J. This suit was brought by *Harned,* as the endorsee of a bill of exchange for $1210 20, payable at thirty days after date, drawn at Philadelphia, on the 19th February, 1848, by *James Robertson,* master of the barque Duc d'Orleans, in favor of *Heald, Buckner & Co.,* for their disbursements on account of the vessel in the port of Philadelphia. It was drawn on *Churchman* of New Orleans, the former owner of the barque, and was accepted by him. The bill was protested at maturity, and, on the 24th March, 1848, this action was brought against the acceptor; and *Woodruff,* the present owner of the barque, upon which a lien is claimed, was made a defendant, The barque was sequestered. The plaintiff had judgment in the court below against *Churchman,* with a privilege on the barque. *Woodruff* has appealed.

The barque left New Orleans, her home port, about the 1st January, 1848, consigned by *Churchman* to *Heald, Buckner & Co.* In a letter of the 3d January, he remarks, to them:—"I am arranging a bill of sale of the Duc d'Orleans, and will forward that also." The barque arrived at Philadelphia, on the 4th February, 1848, and left that port for New Orleans on the 19th. Part of her cargo was for the owner's account, so that her freight list to Philadelphia produced only $443 95, which was collected by *Heald, Buckner & Co.,* and carried by them to *Churchman's* credit in account. They had had previous dealings; and the antecedent charges against *Churchman* seem to have been more than sufficient to absorb the freight money. The vessel, while at Philadelphia, incurred various

expenses for services and supplies by carpenters, sail-makers and chandlers, for towage, pilotage, custom-house charges, &c; for the payment of these, and also in the form of cash advances to the captain ( for what purpose, or upon what representation, does not apper, ) *Heald, Buckner & Co.* disbursed a sum which amounted, with the customary commission and interest, to $1210 20 ; and for this amount the captain's bill on *Churchman* was taken.

*Churchman* sold the barque on the 11th, January, 1848, to *De Coverly* and others. The purchasers got out a new register, on the 18th March, 1848. They resold the barque at auction, on the 23d March, 1848, to the appellant.

It may be conceded, for the purpose of the present enquiry, that, by the transfer of the bill of exchange, the holder may be considered as equitably invested with any accessary rights which accompanied it in the hands of the payees, who made the advances in consideration of which it was drawn.

Looking to all the facts of this case, we think it has been properly said by the appellant's counsel that, the money must be considered as having been advanced solely on the personal credit of the owner. He was the former correspondent of *Heald, Buckner & Co.* They were consignees of the vessel. They also were aware that he contemplated selling her. They permitted the vessel to depart, and took a bill of exchange at thirty days, on *Churchman*, payable in New Orleans, for the amount of the advances.

In a very extended examination of the authorities upon the maritime law, we have not met with a single case, where, under like circumstances, a tacit hypothecation of the vessel in favor of the consignee has been recognized. If we look to the doctrine of special hypothecation or bottomry, the well settled principles of the maritime law respecting the contract are pregnant with an implication against the plaintiff's pretensions. The writers are unanimous in ·a jealous restriction of the captain's power to hypothecate by bottomry. It must appear that the advances were made for repairs, or supplies, necessary for the voyage, or for the safety of the ship, and that the repairs or supplies could not be procured on reasonable terms, or with funds within the master's control, or upon the credit of the owner independent of the hypothecation. See Kent's Com. p. 171.

*Benecke*, in speaking of bottomry, remarks: "It frequently occurs, that the master of a vessel is under the necessity of borrowing money abroad, for the purposes of the voyage. If this happens at a place where the owner of the vessel has friends or correspondents, the master applies to them first ; and they usually furnish him with the money required, for which they draw bills, including commission and interest, either or the owner, or on such other house as he may direct. But if, either the correspondents refuse to advance the money, or if it be wanted at a place where the master is not able to raise it upon bills, he is often reduced to the necessity of mortgaging, according to circumstances, either the vessel, or the vessel and cargo." In *Rucker & Co.*, v. *Conyngham*, 2 *Peters' Ady*. 302, Judge Peters observes: " It is essential to the lawful exercise of this power that, no other means of procuring funds at the place required, should exist. Of course, if the owners have agents or consignees, who have either funds or property to furnish, or are bound to afford means on the personal credit of the owners, this power in the captain is excluded." *Mr. Jacobson*, citing the ordinance of *Bilbao* as his authority, says the master, if he requires money for the prosecution of the voyage which he cannot have advanced upon his average money, or obtain by bills upon his owners, is authorized to lien the ship by bottomry. Laws of the Sea, p. 359.· In the case of the *Alexander*, 1 Dodson, 279, Sir William Scott sustained a bottomry bond given to the consignee of the cargo,

saying that as they had no knowledge of the owners of the ship, it must have been that they looked to the ship itself for their security.    See also Holt on Shipping, vol. 1. 399.    *The Aurora*, 1 Wheaton ,104. Smith's Mercantile Law, 350:

The plaintiff's counsel has cited *Boulay Paty* in support of the tacit hypothecation or privilege.    The language of that author is:  "Le privilége n'en compte pas moins au preteur, quoique l'acte de pret soit tout autre qui'un contrat à la grosse.    Aujourd'hui le capitaine peut avoir recours a l'emprunt simple par lettre de change, ou autrement, pour subvenir aux necessités du navire."    Cours de Droit Commercial Maritime.    The case of the owners, consignees and correspondent is not mentioned by this writer as falling within the rule.    But however that may be, it must be observed that he is commenting upon the special legislation of the french Code of Commerce, and that the privilege which it grants, is not recognized, without the observance, at the time of the loan, of formalities which  seem to point to a contemplation of the credit of the vessel as well as that of the owner.    See Code of Commerce, 191, 192, no. 5.

In looking into the english and american authorities we find that, the taking of a bill of exchange upon the owner is considered as creating a presumption that the credit is personal.    Thus, in the case of a mariner, whose claim is peculiarly favored in admiralty : a sailor having been offered  his wages in money, elected to take part thereof in a bill of exchange on the owner, who afterwards became a bankrupt, in consequence of which the bill was dishonored.    It was held that he was not entitled to arrest the ship for wages to the amount of such bill, on the ground that, having made his election, he must stand by the risk.    The *William Money*, 2 Haggard, 136.

In *Murray* v. *Lazarus*, 1 Paine, 572, the case was thus : The vessel, bound from New Orleans to New York, put into Wilmington in a damaged state, when the master, having no other means, obtained advances from the libellants for the necessary repairs, and gave them a draft for the amount on his consignees, which was expressed to be for value received  " in disbursements and repairs of the brig *Hannah*."    It was protested for non-acceptance ; and, on a libel against the freight in the hands of the consignees, it was held that, the taking of a draft was a waiver of the lien, if any existed.

In the case of the brig *Nestor*, 2 Sumner, 87, Mr. Justice Story remarked that the receipt by a material-man of the owner's negotiable note, "is direct proof that credit is given to the personal responsibility of the owner, and presumptive proof that no credit is given to the ship ; or, in other words, that there is a waiver of any lien on the ship.    It cannot be ordinarily presumed that a ship owner, giving a negotiable note for supplies, intends, at the same time, that a lien shall exist on thes hip itself for the debt ; for the lien might be in the hands of one person, and the negotiable security in the hands of another.    To bring the present case within the reach of that decision it should be shown that, a promissory negotiable note of the master, or owner, had been taken by the libellant ".

It is certainly very difficult to reconcile the opinion in the case of the *Nestor*, and that of Lord *Stowel*, in 2 Haggard, with the subsequent opinion in the case of the bark *Chewson*, 2 Story, 466.    But, whatever be the weight of the later opinion, the case is distinguishable in this respect from the present, that there the material-man was the libellant, and here the tacit hypothecation or privilege is claimed by the owner's correspondent, the consignee of the vessel

It is the duty of courts, in all commercial nations, to extend the rule of national comity to bottomry bonds, and such other maritime hypothecations as are recogni-

zed by the general assent of the commercial world. But the public policy of recog- HARNED
nizing implied hypothecations or liens, as following property from foreign countries, CHURCHMAN.
may well be questioned. That is also a safe rule of our jurisprudence, which re-
gards privileges as *stricti juris*, and not to be extended to doubtful cases.

It is, therefore, decreed that the judgment of the court below, as to said *Wood-
ruff*, be reversed, and and that there be judgment in his favor; and that the claim
of privilege upon the said barque Duc d'Orleans be rejected; the cost of the se-
questration, of the proceedings against *Woodruff*, and of this appeal, to be paid
by the plaintiff.